James F. **BLUMSTEIN**

v.

Buford **ELLINGTON**, Governor of the
State of Tennessee, et al.

**Civ. A. No. 5815.**

United States District Court,
M. D. Tennessee,
Nashville Division.

Aug. 31, 1970.

Probable Jurisdiction Noted
March 1, 1971.
See 91 S.Ct. 920.

James F. Blumstein, pro se.

Robert H. Roberts, Asst. Atty. Gen., Thomas E. Fox, Deputy Atty. Gen., David M. Pack, Atty. Gen. and Reporter of Counsel, Nashville, Tenn., for defendants.

Before PHILLIPS, Circuit Judge, and BROWN and GRAY, District Judges.

FRANK GRAY, JR., District Judge.

This is an action for a declaratory judgment and supplementary injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202, in which plaintiff, in his own behalf and on behalf of all others similarly situated, attacks the three-month and one year durational residency requirements on voting and voter registration contained in Article IV, Section 1 of the Tennessee Constitution and its statutory implementations in the Tennessee Code Annotated as repugnant to the Constitution of the United States of America. A three-judge court, required by 28 U.S.C. § 2281, has been convened under the provisions of 28 U.S.C. § 2284.

Plaintiff moved to Tennessee on June 12, 1970, and established his home in Nashville. He is under contract of employment as assistant professor of law at Vanderbilt Law School, and, consequently, intends to remain in Nashville indefinitely. He is thus a *bona fide* resident of the State of Tennessee, and this is undisputed.

On July 1, 1970, plaintiff appeared at the office of the Registrar-at-large of Davidson County, where he attempted to register to vote. He was informed that, in order to qualify for registration, he had to have been a resident of David-

son County for the three-month period next preceding the forthcoming election (to be held August 6, 1970) and a resident of the State of Tennessee for the one year period next preceding that election. Accordingly, his attempt to register was refused.

Pursuant to T.C.A. § 2–319, plaintiff appealed the decision of the Registrar-at-large to the Davidson County Election Commission. At his appearance before the Election Commission, he was informed that the durational residency requirements were mandatory and that no exceptions could be made in his, or any other, case. Having thus exhausted his state statutory administrative remedies, he brought this action.

In his original complaint, plaintiff ignored the fact that the durational residency requirements herein under consideration are contained not only in T.C.A. § 2–201, but also in the Tennessee Constitution. He has therefore amended his complaint so that the validity of both the constitutional and the statutory provisions is placed at issue in this case. It also appears that the Tennessee durational residency requirements apply to voter registration, as well as to actual voting, by virtue of T.C.A. § 2–304. We hereby take judicial notice of that fact, and the remainder of this opinion is thus addressed to the following issue: Whether the one year and three-month durational residency requirements contained in Article IV, Section 1 of the Tennessee Constitution, in T.C.A. § 2–201, and in T.C.A. § 2–304 are repugnant to the Constitution of the United States.

■ We are faced at the outset by the problem of whether this is a proper case in which to consider the validity of the three-month requirement. The August 6, 1970, primary and general elections have already been held, and plaintiff will have met the three-month requirement by the time of the November general election. As indicated above, plaintiff originally desired to vote in the August elections, and, to do so, he requested that this court issue a temporary injunction which would have had the effect of open-

ing the Davidson County voter registration rolls to him and to all others similarly situated so that they could participate.

The temporary injunction was refused by this court on the ground that it would be "so obviously disruptive as to constitute an example of judicial improvidence."

Aware that he will have met the three-month requirement by the time of the November election, plaintiff next filed a motion to be allowed to cast a sealed provisional ballot in the August 6, 1970, primary and general elections, with the clerk of this court, thus keeping the three-month aspect of the case alive as to him, pending ultimate adjudication on the merits, and avoiding dismissal of that issue as moot. This motion was denied also, on grounds essentially the same as those for our refusal to issue the temporary injunction.

Despite plaintiff's fears as to the possible mootness of the three-month requirement issue, we are of the opinion that "[n]one of the concededly imperative policies behind the constitutional rule against entertaining moot controversies would be served by a dismissal in this case," Sibron v. New York, 392 U.S. 40, 57, 88 S.Ct. 1889, 1900, 20 L.Ed. 2d 917 (1968), and that, indeed, the three-month issue has not been rendered moot by the passage of the August elections without plaintiff's having been allowed to participate therein.

Controlling authority for such a view is found in Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969) —a case identical, in principle, to the one at bar. There, as here, preliminary extraordinary relief was withheld because of the administrative difficulties which would have been entailed by its implementation. The election was then conducted, and, as a result, the defendants argued that the case had been rendered moot. The Supreme Court disagreed. Applying the test first enunciated in Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911), the Court held that "[t]he problem is * * * 'capable of repetition, yet evading review' [citation omitted], [and] [t]he need for its resolution thus reflects a continuing controversy in the federal-state area. * * *" *Moore, supra,* 394 U.S. at 816, 89 S.Ct. at 1494.

That the Tennessee three-month residency requirement raises precisely such a problem—"capable of repetition, yet evading review"—is obvious from a cursory analysis of the factual situation which such a requirement creates. As stated by Mr. Justice Brennan, in his dissenting opinion in the case of Hall v. Beals, 396 U.S. 45, 50, 90 S.Ct. 200, 203, 24 L.Ed.2d 214 (1969), with reference to the Colorado two-month residency requirement:

"[T]he constitutional challenge to the * * * Colorado statute is peculiarly evasive of review. This is because ordinarily a person's standing to raise that question would not mature unless he had become a Colorado resident within two months prior to a[n] * * election. Barring resort to extraordinary expedients, that interval is obviously too short for the exhaustion of state administrative remedies and the completion of a lawsuit * * *."

This reasoning applies with equal force to the case at bar. Indeed, it applies with greater force, because of the fact that unlike the *Hall* situation (discussed at greater length, *infra*), there has been no amendment to the Tennessee three-month provision taking the plaintiff out of the class aggrieved by it.

At first blush, the recent decision of the Supreme Court in *Hall, supra,* wherein an action challenging the validity of the Colorado durational residency requirement was held to be moot, might appear to have implications for the case at bar. Nevertheless, this court is of the opinion that the decision in that case is inapplicable to the instant situation.

In *Hall,* prior to the ultimate adjudication of the controversy, the statute called

into question was amended by the Colorado Legislature. Thus, viewing " * * the Colorado statute as it now stands, not as it once did * * *," the Supreme Court concluded that, unlike the plaintiff in the instant case, " * * * under the statute *as currently written*, the appellants could have voted in [the election in question] * * *," and therefore the case was no longer " * * * a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law." *Hall, supra*, at 48, 90 S.Ct. at 201 (emphasis added).

The Court noted that the election was over, that it was impossible to grant plaintiffs the relief they had prayed for, and that they had, in fact, satisfied the residency requirement originally under attack. Nevertheless, the Court specifically noted that the case's mootness was " * * * *apart* from these considerations. * * *" (emphasis added). In short, the case was held to be moot not because the election had already been held, but rather because the statute under attack was no longer operative. Thus a ruling on the validity of the pre-amendment statute would, indeed, have been nothing more than an advisory opinion on an abstract proposition of law. The Court found it " * * * impossible to grant appellants the relief they sought in the District Court," because relief of any kind quite obviously cannot be granted against the operation of a nonexistent statute. The Tennessee requirement, quite unlike that of Colorado, remains in full force and effect, and thus the mootness holding in Hall v. Beals, as well as the rationale for that holding, is inapplicable to the case at bar.

The *Hall* Court also refused to consider plaintiffs' belated attack on the Colorado statute as amended. Although the Court stated that the " * * * amendatory action of the Colorado Legislature has surely operated to render this case moot," it is clear that the Court's refusal to consider the amended statute was actually based more on the question of plaintiffs' standing to challenge it than on the doctrine of mootness. The Court specifically noted that the amended statute did not affect either the plaintiffs' " * * * present interests, or their interests at the time this litigation was commenced," and that they had never been members of the class aggrieved by the amended statute. Very clearly, there is a vast difference between holding a case to be "moot" when it involves an attack upon a statute by a plaintiff who has never been affected by that statute in any fashion whatsoever and in holding a case to be "moot" when, as in the case at bar, the plaintiff has been directly affected by the statute under consideration and has attacked its validity consistently, by means of every procedure available to him. Thus, given the factual situation in Hall v. Beals, the Supreme Court had no alternative but to hold as it did. But it is different here, and the considerations of mootness and standing raised in *Hall* do not apply.

The fact that the *Hall* rationale does not apply to the case at bar is graphically demonstrated in a case decided the same day as Hall v. Beals. That is the case of Brockington v. Rhodes, 396 U.S. 41, 90 S.Ct. 206, 24 L.Ed.2d 209 (1969), in which the Supreme Court also dismissed an attack upon a state election law for mootness. There, as in *Hall*, the statute in question had been amended before final adjudication of the controversy, and the election had already been held. The Court noted, however, that the plaintiff in that case, unlike those in *Hall*, was still aggrieved by the statute as amended. Consistent with our discussion of the inapplicability of *Hall* to the case at bar, *supra*, the Supreme Court in *Brockington* refused to hold that that case was mooted merely because of the statutory amendment and subsequent election. Rather, it based its holding of mootness squarely on the ground that plaintiff had " * * * sought *only* a writ of mandamus to compel the appellees to place his name on the ballot as a candidate for a particular office in a particular election * * *," *Brockington, supra*, at 43, 90 S.Ct. at 208 (emphasis added), and that

such relief was obviously impossible once the election had taken place. In fact, the Court indicated that relief might well have been forthcoming if plaintiff's prayers had been for broader measures: "He did not sue for himself and others similarly situated as independent *voters*, as he might have * * *, [and] [h]e did not seek a declaratory judgment, although that avenue too was open to him."

Since plaintiff herein has, in fact, brought a class action seeking a declaratory judgment, it is clear that, unlike either *Hall* or *Brockington*, the relief he requests is still available. Thus neither of those cases constitute precedent which would warrant a refusal by this court to consider the three-month requirement whose constitutional validity this plaintiff has challenged. Indeed, *Brockington* can only be read as supporting the view that plaintiff's attack upon this requirement has not been rendered moot by the fact that the August 6, 1970, elections have already been held.

This court is thus of the opinion that plaintiff's case is not moot as to the three-month requirement. Further, plaintiff is still a member of the class aggrieved and will remain so until September 12, 1970.[1] It follows that this is an appropriate case in which to consider the validity of the Tennessee three-month requirement, along with that State's one year requirement, and this court so holds.

Given, then, the fact that both the Tennessee one year and three-month requirements are properly before this court for consideration, it remains to determine the appropriate standard against which to test their constitutionality.

"It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, * * *" Reynolds v. Sims, 377 U.S. 533, 554, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964). It is, however, universally conceded that " * * * the States have the power to impose reasonable * * * requirements on the availability of the ballot," Kramer v. Union Free School District No. 15, 395 U.S. 621, 625, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969), and for this reason "[t]he States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised, * * *" Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 50, 79 S.Ct. 985, 989, 3 L.Ed. 2d 1072 (1959). Thus, as recently as 1964, a state's durational residency requirement, which was substantially identical to those of Tennessee, was upheld as constitutionally valid, Drueding v. Devlin, 234 F.Supp. 721 (D.C.Md.1964), affirmed per curiam, 380 U.S. 125, 85 S.Ct. 807, 13 L.Ed.2d 792 (1965), on the ground that such requirements are permissible, unless they are " * * * so unreasonable that they amount to an irrational or unreasonable discrimination" among otherwise qualified voters. *Drueding, supra,* 234 F.Supp. at 725.

Nevertheless, it has lately become apparent that the *Drueding* standard is no longer viable law. " * * * [H]istory has seen a continuing expansion of the scope of the right of suffrage in this country. * * * [for the] right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds, supra,* 377 U.S. at 555, 84 S.Ct. at 1378. For this reason, durational residency requirements are

---

1. For this reason the court need not consider the question of whether plaintiff could still maintain suit to protect the rights of the class even if he were no longer a member of it. In this connection, *see generally* Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); Walling v. Haile Gold Mines, 136 F.2d 102 (4th Cir. 1943); Buckner v. County School Board, 332 F.2d 452 (4th Cir. 1964); Cypress v. Newport News General and Nonsectarian Hospital Association, 375 F.2d 648 (4th Cir. 1967); Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968); Esteban v. Central Mo. State College, 415 F.2d 1077 (8th Cir. 1969).

rapidly falling into greater and greater disfavor as an undue stricture on the "scope of the right of suffrage" of American citizens. Thus, while the legislative history of the Voting Rights Act Amendments of 1970 reveals that "[i]n the course of its deliberations the [House Judiciary] committee separately considered and rejected * * * an amendment establishing a uniform residency requirement for voting for President and Vice President of the United States" (U. S.Code Congressional and Administrative News, July 20, 1970, at p. 2155), state durational residency requirements on voting for those two offices were officially abolished in the final version of that Act.[2]

Certain of the language employed by Congress in the 1970 Amendments is applicable to the case at bar and is worth quoting in the present context:

"Sec. 202. (a) The Congress hereby finds that the imposition and application of the durational residency requirement as a precondition to voting for the offices of President and Vice President, and the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections—

(1) denies or abridges the inherent constitutional right of citizens to vote for their President and Vice President;

(2) denies or abridges the inherent constitutional right of citizens to enjoy their free movement across State lines;

(3) denies or abridges the privileges and immunities guaranteed to the citizens of each State under article IV, section 2, clause 1 of the Constitution;

(4) in some instances has the impermissible purpose or effect of denying citizens the right to vote for such officers because of the way they may vote;

(5) has the effect of denying to citizens the equality of civil rights, and due process and equal protection of the laws that are guaranteed to them under the fourteenth amendment; and

(6) does not bear a reasonable relationship to any compelling State interest in the conduct of presidential elections."

The court feels that these findings reflect the current trend of the law. Moreover, it is obvious that the "irrational or unreasonable" test for the constitutionality of voting rights statutes enunciated in *Drueding, supra,* has been superseded by the "compelling state interest" test mentioned by Congress in subsection (6) of the 1970 Amendments, *supra.*

The evolution of this latter test need not be herein elaborated, for it is clear that, as said by the three-judge court in Burg v. Canniffe, 315 F.Supp. 380 (D. Mass. July 8, 1970), "[a]ny lingering doubts that the compelling interest test must be used in determining the validity of state voting statutes * * * [were] permanently put to rest by two decisions of the Supreme Court handed down * * * on June 15, 1970, in Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370, * * * and on June 23, 1970, in City of Phoenix v. Kolodziejski,

---

2. Part of the reason for the Committee's rejection of the proposal was that it anticipated a case then pending in the Supreme Court. That case, of course, was Hall v. Beals, *supra,* in which the Colorado durational residency requirement on voting in presidential elections was placed at issue. However, as mentioned at length above, by virtue of an amendment to the Colorado statutes, which shortened the period, the matter was held to have become moot as to the plaintiffs, and the case was dismissed for that reason. There is thus at present no definitive ruling by the Supreme Court on the validity of such requirements as those at issue in the case at bar. *But see* the dissenting opinions of Brennan, J., and Marshall, J., in Hall, *supra,* 396 U.S. at 50 and 51, 90 S.Ct. 200, respectively, *and* Burg v. Canniffe, *infra,* in which a statutory three-judge court struck down a Massachusetts requirement.

399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523, . . ."

In Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370, the Court said:

"Moreover, the right to vote, as the citizen's link to his laws and government, is protective of all fundamental rights and privileges. * * * [Citations omitted.] And before that right can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny."

It follows, then, that the validity of the Tennessee provisions herein in question must be judged according to the "compelling state interest" standard. It remains to examine this standard in more detail and then to apply it to the Tennessee durational residency requirements.

"The 'compelling interest' doctrine has two branches. * * * [One] branch * * * requires that classifications [among citizens] based upon 'suspect' criteria be supported by a compelling [state] interest * * *." Shapiro v. Thompson, 394 U.S. 618, 658, 89 S.Ct. 1322, 1344, 22 L.Ed.2d 600 (1969) (Harlan, J., dissenting). Certain of the classifications which have in the past been held to be "suspect" include those based upon race, Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), upon wealth, Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), upon political allegiance, Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed. 2d 24 (1968), and, since the holding in Shapiro, supra, those based upon interstate movement.

"The second branch of the 'compelling interest' principle is * * *

that a statutory classification is subject to the 'compelling interest' test if the result of the classification may be to affect a 'fundamental right,' regardless of the basis of the classification." Shapiro, supra, 394 U.S. at 660, 89 S.Ct. at 1345 (Harlan, J., dissenting). And it is now settled beyond doubt that the right to vote is just such a "fundamental right"—indeed, the most fundamental right of all:

" 'Since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.' [Citation omitted.] This careful examination is necessary because statutes distributing the franchise constitute the foundation of our representative society. * * * Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are *necessary to promote a compelling state interest*. * * *" Kramer, supra, 395 U.S. at 626, 627, 89 S.Ct. at 1889, 1890 (emphasis added).

In short, since there is no question (1) that the classification of *bona fide* residents on the basis of recent arrival in Tennessee, as made by the Tennessee durational residency requirements, is "subject," and (2) that those requirements otherwise infringe upon one of the fundamental civil and political rights of the citizens of Tennessee—the right to vote—the Tennessee durational residency requirements must be held to be constitutionally invalid, unless they are shown to be necessary to promote a compelling state interest.[3]

---

3. The three-month requirement affects not only recent arrivals from out of state, but also those who have recently changed their county of residence within Tennessee. Individuals in this latter category, however, are permitted to vote in their former counties of residence for ninety days after they have removed therefrom—provided they were properly registered to vote in such county—by virtue of T.C.A. § 2–304. This court need not consider, however, whether this classification, which forces certain Tennesseeans to return to their former counties to vote, is one based upon "suspect" criteria, for it is clearly one affecting a "fundamental right" and, as

**330**

■ Given, then, the test to be applied, it is our opinion that the Tennessee durational residency requirements fall short of meeting it. The only constitutionally permissible purpose of such requirements is " * * * to secure the freedom and purity of the ballot box in the various counties of the state by preventing plural voting and by requiring voters to vote in the election precincts in which they reside * * *." T.C.A. § 2–301. The question of whether such a purpose constitutes a "compelling state interest" need not be pursued in the present context, for, assuming that Tennessee's interest in promoting freedom and purity of the ballot box and preventing plural voting is a compelling one, it is clear that that State's durational residency requirements are in no wise "necessary" to promote such an interest. That such purposes are better served by the application of a system of voter registration than by durational residency requirements is amply demonstrated by the fact that the section of the Tennessee Code Annotated in which the foregoing quotation appears is entitled "Purpose of *voter registration system*" (emphasis added) and by the fact that this section is the only one in the Tennessee Code Annotated dealing specifically with protection of the "compelling state interest" which defendants assert is instead protected by the Tennessee durational residency requirements.

As is provided in the case of presidential elections by the Voting Rights Act Amendments of 1970, *supra*, T.C.A. § 2–304 provides that " * * * registration or reregistration shall not be permitted within thirty (30) days of any primary or general election provided for by statute." This reflects the judgment of the Tennessee Legislature that thirty days is an adequate period in which Tennessee's election officials can effect whatever measures may be necessary, in each particular case confronting them, to insure purity of the ballot and prevent dual registration and dual voting. It is clear that, in actuality, Tennessee's interest in these matters is protected by the thirty-day period, and not by that State's durational residency requirements. Neither the purpose of, nor the justification for, these latter requirements can be found in either the Tennessee Constitution or the Tennesee Code Annotated, and this court is of the opinion that they are not "necessary" to promote any "compelling state interest" and, indeed, serve no valid purpose.

■ Unquestionably, Tennessee may constitutionally require individuals to be *bona fide* residents before allowing them to vote in the State. Nevertheless, it is equally beyond question that if such persons " * * * are in fact residents, with the intention of making * * * [Tennessee] their home indefinitely, they, as all other qualified residents, have a right to an equal opportunity for political representation," Carrington v. Rash, 380 U.S. 89, 94, 85 S.Ct. 775, 779, 13 L.Ed.2d 675 (1965), and the fact that they may be recent arrivals from out of state confers no right upon that state arbitrarily to deny them the franchise.

Accordingly, it is the judgment of this court that the one year and three-month durational residency requirements contained in Article IV, Section 1 of the Tennessee Constitution, in T.C.A. § 2–201, and in T.C.A. § 2–304 are repugnant to the Constitution of the United States of America, and are therefore null, void, and of no effect.

such, comes within the "second branch" of the compelling interest test. Moreover, the three-month requirement raises the equal protection issue, over and above the "suspect" criteria and "fundamental right" rationales, when one compares its effect upon recent intrastate movers with its effect upon recent arrivals from out of state. Persons in the latter category are given no opportunity at all to vote in Ten-

nessee, while those in the former may vote for ninety days in their former counties of residence. Thus, insofar as the right to vote in Tennessee is concerned, the State's three-month durational residency requirement is not applied equally to all persons who have moved into a given county within the three-month period next preceding an election.

An order to implement this decision and providing for appropriate injunctive relief will be submitted by counsel within ten (10) days.